UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ALANN VEGA, R-04203,

    Plaintiff,

    v.

MARCUS HARDY,

    Defendant.

No. 13 C 8624
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiff and Defendants' cross-motions for summary judgment. For the following reasons, both Motions are denied.

### BACKGROUND

Plaintiff Alann Vega ("Vega") is an inmate who has been incarcerated at Stateville Correctional Center since 2006. At all relevant times, Defendant Marcus Hardy ("Warden Hardy") was the Chief Administrative Officer and Warden of Stateville.

Vega is an African Hebrew Israelite and has continued to practice his religion while at Stateville. Stateville was aware of Vega's religious beliefs and officially designated him as an African Hebrew Israelite in 2006. Stateville has accommodated Vega's religiously mandated vegan diet as well as his weekly attendance at Hebrew Israelite services and weekly participation in the Hebrew Israelite study group. In the spring of 2011, Vega took a Nazirite vow and grew a portion of hair known as a kouplock from the crown of his head. He treats the kouplock as a spiritual antenna to God. Vega testified that the kouplock is not "specifically" a tenet of the African Hebrew Israelite religion, but "is just my interpretation of what it means to be redeemed." Further, he acknowledged that the kouplock is associated with "various indigenous

1

tribes of people" in Mexico and throughout the continent.

The grooming policy at Stateville, which applies to all inmates, states in part, "[S]ecurity risks shall include occasions where: a.) the hairstyle impedes or prevents staff from conducting a thorough search of the hair for contraband; b.) contraband hidden in the hair may not be detected; c.) contraband hidden in the hair may injure staff attempting to search the hair; d.) the hairstyle signifies a security threat group affiliation." Prison officials may also determine that some inmates require an individual grooming policy, should their hairstyles pose security risks.

Vega alleges that on June 23, 2011, while walking back to his cell, he was pulled out of line by Warden Hardy and Major Donald Niles ("Niles"). At this time, Vega states that his kouplock was about four inches in length. Warden Hardy allegedly demanded that Vega remove his kouplock, even as Vega tried to explain its religious significance. When told that Vega was an African Hebrew Israelite, Warden Hardy allegedly replied that Vega could not wear the kouplock unless he had "Native American" on his prison ID. Vega recalls Warden Hardy telling him, "The next time I see you, it better be gone or else." Vega also alleges that a Christian inmate, Robert Ornelas ("Ornelas"), was allowed to wear his hair in a kouplock hairstyle.

Warden Hardy's account of this encounter differs on numerous key points. According to Warden Hardy, he ordered Vega's hair to be cut because it was in violation of the grooming policy and "could be associated with a security threat group/gang affiliation." He claims that he explained the grooming policy and consequences of non-compliance to Vega, but did not tell Vega he had to cut his hair *because of* his religion or that Native Americans or members of any other religion were permitted to wear the kouplock hairstyle. Warden Hardy also argues that if he had seen Ornelas wearing a kouplock, he would have ordered him to comply with the grooming

2

policy just as he did with Vega. Further, he notes that although other prison officers may have seen Ornelas wearing the kouplock, only Warden Hardy had the authority to make individualized determinations about the grooming policy as applied to specific inmates. Thus, Warden Hardy contends, the fact that other officers may have knowingly permitted Ornelas to wear a kouplock would not speak to the prison's official policy regarding kouplocks.[1]

The same day as his encounter with Warden Hardy, Vega filed a grievance with his counselor, David Mansfield ("Mansfield"), alleging religious discrimination and requesting that Warden Hardy rescind his order. Mansfield denied the grievance on July 18, 2011, writing that Vega "may be" subject to the individual grooming policy, which would prohibit wearing the kouplock. For the next several months, Vega remained in his cell except for religious services and wore a hat to hide the kouplock from Warden Hardy. He also appealed to grievance officer and counselor Anna McBee ("McBee") on July 26, 2011. On August 10, Warden Hardy wrote Vega a letter stating, "On the day you were searched, you were not in compliance and you are expected to comply with the direction given. . . There is no reason for you to remain in your cell, your allegations of being threatened are unfounded and can not [sic] be substantiated."

After several months awaiting the outcome of his grievance and largely remaining in his cell so as not to invite further reprimand, Vega cut off his kouplock. On March 5, 2012, McBee responded to Vega's grievance, observing that Vega voluntarily cut off his kouplock and "no action [was] necessary." Vega appealed to the Director of the Illinois Department of Corrections on March 19, 2012 and that grievance was denied in November 2012. After exhausting his administrative remedies, Vega filed this lawsuit pursuant to 42 U.S.C. § 2000cc-1 (the Religious

---

[1] I have not summarized here and will not consider Vega's claims about Ornelas' statements regarding his own experience with the grooming policy, or Internal Affairs Officers Eva Aguero and Cheri Tarr's comments regarding the policy, as these are inadmissible as hearsay to the same extent they would be at trial. *LaFlamboy v. Landek*, 587 F.Supp.2d 914, 922 (N.D. Ill. 2008) (citing *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997)).

Land Use and Institutionalized Persons Act of 2000) ("RLUIPA") and 42 U.S.C. § 1983, as well as the First and Fourteenth Amendments of the United States Constitution.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To determine whether any genuine fact issue exists, the court must assess the proof as presented in the record, including depositions, answers to interrogatories, admissions, and affidavits, to view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Fed. R. Civ. P. 56(c); *Scott v. Harris,* 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare, Inc. v. UnitedHealth Grp., Inc.,* 629 F.3d 697, 704 (7th Cir. 2011). If a claim or defense is factually unsupported, the court should dispose of it at the summary judgment stage. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. In response, the non-moving party cannot rest on bare pleadings but must designate specific material facts showing there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548; *Insolia v. Philip Morris Inc.,* 216 F.3d 596, 598 (7th Cir.2000). When ruling on cross-motions for summary judgment, I "construe the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co*., 400 F.3d 523, 526-527 (7th Cir. 2005).

## DISCUSSION

### I. First Amendment/RLUIPA Claim

Under First Amendment jurisprudence, an inmate is entitled to freely practice his religion as long as his practice does not unduly burden legitimate prison concerns. *Richards v. White*, 957 F.2d 471, 474 (7th Cir. 1992). Put another way, a prison regulation that restricts free exercise of religion is valid if "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). The reasonableness test is less stringent in the prison context than it would be for free citizens, out of deference to the special concerns of prison officials and in light of the more limited freedoms accorded to the incarcerated. *O'Lone v. Estate of Shabazz*, 482 US 342, 349 (1987). In addition to assessing the legitimacy of prison regulations, courts examine whether those regulations are applied neutrally within the prison and implemented without regard to the context of the expression. *Turner v. Safley*, 482 U.S. at 90.

RLUIPA states a more demanding test in which a prison shall not "impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . ., even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). Although RLUIPA does not define "substantial burden," the Seventh Circuit has interpreted it to mean a burden that "seriously violates [the inmate's] religious beliefs," *Schlemm v. Wall*, 784 F.3d 362, 364 (7th Cir. 2015) (quoting *Holt v. Hobbs*, 135 S.Ct. 853, 862 (2015)), or "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thompson v. Holm*, 809 F.3d 376, 379-80 (7th Cir. 2016) (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 717-18 (1981)).

5

As a preliminary matter, I find that requiring Vega to cut his kouplock in violation of sincerely held religious beliefs does qualify as a substantial burden on his religious freedoms. Defendant notes that Vega did not wear a kouplock until some years after his conversion to the African Hebrew Israelite faith, but this does not preclude the possibility that Vega has become more devout over time and a burden that may have been minimal at an earlier point in his religious evolution would now be substantial and serious. Indeed, there is nothing in the record to suggest that Vega's belief is not sincere. Defendant also argues that the kouplock is not a religious tenet of the African Hebrew Israelite faith, since Vega admitted in his deposition that it was "consistent" with the hairstyles of indigenous Mexican peoples. Once again, this has no bearing on any independent religious significance the kouplock may have for Vega and other African Hebrew Israelite adherents. Indeed, even if the kouplock is religiously important only to Vega for reasons specific to his personal faith, that fact does not invalidate the sincerity or profundity of his beliefs. The Seventh Circuit has found that RLUIPA does not require that a religious practice be "compelled by" or "central to" the practitioner's faith—rather, it need only be a "sincerely held religious belief." *Koger v. Bryan*, 523 F.3d 789, 798 (7th Cir. 2008) (finding that prison officials cannot deny a special religious diet to an inmate merely because the religion "does not impose dietary restriction on all its members, but . . . such restrictions are practiced by some."). *See also Grayson v. Schuler*, 666 F.3d 450, 453-54 (7th Cir. 2012) (finding that a prison cannot "permit only members of sects . . . that 'officially' require the wearing of dreadlocks to wear them. Heretics have religious rights.").

**A. RLUIPA Test**

Having determined that this policy does impose a substantial burden on religiously motivated kouplock-wearers such as Vega, I proceed to the two-pronged RLUIPA test. The first

prong is plainly met, as courts have repeatedly found safety and security, the rationale put forth by Defendant in this case, to be a compelling governmental interest. *See, e.g.*, *Kaufman v. McCaughtry*, 419 F.3d 678, 683 (7th Cir. 2005) (stating that "Prison officials unquestionably have a legitimate interest in maintaining institutional security") (citing *Lindell v. Frank*, 377 F.3d 655, 658-59 (7th Cir. 2004)). In this case, Warden Hardy argues that its association with gang symbols renders it a potentially incendiary hairstyle that could provoke tension or violence among inmates. Meanwhile, Plaintiff has not presented any evidence to show that the prison has no need to regulate inmates' hair length. On the contrary, prison grooming policies prohibiting dreadlocks and similar hairstyles have been repeatedly found to be rationally related to compelling governmental security concerns. *See, e.g., Lewis v. Sternes*, 712 F.3d 1083 (7th Cir. 2013); *Williams v. Snyder*, 367 Fed.Appx. 679 (7th Cir. 2010); *Rose v. Snyder*, 2007 WL 627456 (S.D. Ill. 2007).

With regard to the second prong, Vega asserts that the grooming policy is not the least restrictive option to address prison security concerns but he gives no evidence to support this assertion, nor does he offer any less restrictive alternative. Moreover, many courts have considered similar grooming policies (albeit more often with regards to dreadlocks, rather than the singular kouplock), and determined that keeping inmate hair short is the least restrictive option in the prison context. *See, e.g. Lewis v. Sternes*, 712 F.3d 1083 (7th Cir. 2013); *Collins–Bey v. Thomas,* 2004 WL 2381874, at *3 (N.D. Ill. Oct. 25, 2004) ("As best as we can determine, every Circuit to address the issue has held that regulations of inmate hair length satisfy the least restrictive means test.") Thus, I find that Defendants have met both the compelling government interest and least restrictive means prongs of the RLUIPA test.

**B. General Applicability**

In addition to providing a compelling government interest and accomplishing that purpose with the least restrictive means, Defendant argues that the regulation is valid under the First Amendment because it does not discriminate for or against a particular religion or religious sect. *See, e.g. Employment Division v. Smith*, 494 U.S. 872 (1990) (holding that in a Free Exercise Clause case, a "neutral law of general applicability" will not generally violate the First Amendment).[2] Here, Vega says that Warden Hardy told him he needed the designation "Native American" on his ID in order to be granted an exception from the grooming policy's ban on long hair, suggesting that the prison regulation impermissibly contains exceptions for some religious traditions but not others. Vega cites a recent Seventh Circuit case holding that a prison cannot permit "Rastafarians to wear long hair and without justification forbid a sincere African Hebrew Israelite of Jerusalem to do so, even if he is more zealous in his religious observances than his religion requires him to be," and even if his faith does not "officially" require the hairstyle. *Grayson v. Schuler*, 666 F.3d 450, 455 (7th Cir. 2012) (further noting that the prison "has failed to give a reason for thinking that the plaintiff but not [Rastafarians] would be a security risk if allowed to wear them."). *See also Reed v. Faulkner*, 842 F.2d 960, 964 (7th Cir. 1988) (holding that a prison cannot forbid Rastafarians to wear long hair while permitting American Indians to do so). According to Vega, this is the de facto policy to which he was subjected at Stateville.

The question of Defendant's liability, then, depends on questions that I cannot answer here, including whether or not Warden Hardy said that Native Americans were permitted to wear

---

[2] In both *Lewis v. Sternes*, 712 F.3d at 1085 and *Grayson*, 666 F.3d 452-53, the 7th Circuit notes the tension between *Smith* and other Supreme Court cases imparting a First Amendment duty of religious accommodation in prisons, *see, e.g. Turner*, 482 U.S. 78; *O'Lone v. Shabazz*, 482 U.S. 342 (1987). Nevertheless, this case, like that in *Grayson*, raises an allegation of arbitrary discrimination that is subject to *Smith*, rather than merely a request for accommodation.

kouplocks but African Hebrew Israelites were not and whether the treatment of Ornelas differed from Vega's for arbitrary or discriminatory reasons. These questions require credibility determinations and possibly additional evidence, rendering them inappropriate for summary judgment. *See, e.g., Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (holding that a court may not make "credibility determinations" at the summary judgment stage). As such, I deny both parties' motions for summary judgment on this count, as there remain issues of material fact to be sorted out at trial.

Finally, I note that Vega points out that Stateville did not follow its own internal regulations for dealing with an alleged violation of the grooming policy. Those regulations include photographing the offending hairstyle, reviewing the case with the Chief Administrative Officer and Chief of Operations, writing an incident report documenting "the specific sanitation or security concerns presented by the hairstyle," ordering compliance, and offering barber services to the offender. Vega says this non-compliance with internal procedure "reek[s] of arbitrariness and discrimination" and speaks to Warden Hardy's motive. I do not agree. Compliance with internal procedure is a disciplinary question for Stateville administrators and does not bear on the constitutionality of Warden Hardy's actions.

## II. Fourteenth Amendment Claim

To prevail on an Equal Protection claim pursuant to § 1983, the plaintiff must show: "(1) that Defendants acted with 'nefarious discriminatory purpose,' and (2) that they 'discriminated against him based on his membership in a definable class,'" not merely his unfair treatment as an individual. *Clark v. Briley*, 2005 WL 2369330 at *5 (N.D.Ill. 2005) (quoting *Nabozny v. Podlesny*, 92 F.3d 446, 453 (7th Cir. 1996)). Discriminatory purpose is found when "a decision maker single[s] out a particular group for disparate treatment" and acts "at least in

9

part for the purpose of causing its adverse effects on the identifiable group." *Nabozny*, 92 F.3d at 453 (quoting *Shango v. Jurich*, 681 F.2d 1091 (7th Cir. 1982)).

Here, Vega does not allege that Warden Hardy targeted him because of his faith, or that Warden Hardy indicated that he wanted Vega to cut his kouplock *because of* his membership in the African Hebrew Israelite religion. The grooming policy provided by Defendants also makes no reference to religion and, on its face, applies equally to all inmates. While Vega does contend that Ornelas, a Christian, was permitted to wear a kouplock, there is no indication in the record that either inmate was disciplined or privileged because of his religion.

However, the record is so sparse and contested on both sides that the question of whether Warden Hardy did illicitly single out Vega because of his religion requires a credibility determination that is more appropriate for a jury. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Thus, I deny both parties' motions for summary judgment on the Fourteenth Amendment claim.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment and Defendant's Motion for Summary Judgment are both denied.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: March 9, 2016